[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11629

Non-Argument Calendar

_____

TORBEN KJAER SOENDERGAARD,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A203-505-087

_____

Before WILSON, LUCK, and ABUDU, Circuit Judges.

PER CURIAM:

Torben Kjaer Soendergaard, a native and citizen of Denmark, petitions for review of the Board of Immigration Appeals' ("BIA") order affirming the Immigration Judge's ("IJ") denial of asylum, and the BIA's denial of his motion to remand the case for the IJ to consider new evidence. First, Soendergaard argues that there was not substantial evidence to support the BIA's determination that he did not have an objective fear of future persecution based on his religious beliefs and practices. Second, he argues that the BIA should have remanded the case to the IJ, and that the BIA abused its discretion in denying his motion to remand in light of a recording that was taken during his individual hearing before the IJ. After review, we deny in part and dismiss in part Soendergaard's petition.

## I.    FACTUAL BACKGROUND & PROCEDURAL HISTORY

In January 2019, Soendergaard was admitted to the United States as a visitor without a visa for a period not to exceed three months. However, he remained in the United States without authorization for longer than the approved three-month period. In June 2022, the Department of Homeland Security ("DHS") sent a notice of intent to issue a final administrative removal order, charging Soendergaard with remaining in the United States beyond his approved period. Soendergaard admitted the allegations in the

notice, but he petitioned for asylum based on a fear of persecution because of his religion.[1]

At an individual hearing before the IJ, Soendergaard testified about the conditions in Denmark that led him to apply for asylum. He stated that he became a Christian at age 18 and practiced Pentecostal-Charismatic Christianity. He was part of a ministry called "The Last Reformation," which he founded in 2011. He explained that he grew up Lutheran, the predominant religion in Denmark. However, in 1995, he went to a Pentecostal church and converted. From there, he became very involved in the Pentecostal religion and began the practice of "casting out demons" around 2001. He started his ministry in Denmark around 2001 or 2002, and later started a YouTube channel and Facebook page, where his following grew. According to him, there were only around 5,000 Pentecostals in Denmark.

Soendergaard further testified that he authored a book entitled "The Last Reformation," explaining that his ministry wanted to see a reformation of the church which challenged the Lutheran church's ideologies. He explained that "The Last Reformation" was more akin to a "movement" and there was no formal

---

[1] Soendergaard also petitioned for withholding of removal and for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, which the IJ and BIA denied. We are not reviewing those denials because Soendergaard failed to challenge them in his petition for review. *See Ruga v. U.S. Att'y Gen.*, 757 F.3d 1193, 1196 (11th Cir. 2014) (holding that issues not raised in a petitioner's brief on appeal are abandoned).

membership.  He claimed that his YouTube channel had around 46 million views and 150,000 subscribers, and he had followers on Facebook from around 70 countries with more than 1,000 house fellowships.  He also claimed that "The Last Reformation" had several physical schools in different countries, online schools, Bible schools, 3 movies in 49 languages, and a podcast, and had a presence in all 50 states.  As the founder, Soendergaard was the main face of "The Last Reformation," and he often appeared on the church's website, in movies, and in some online teachings.

According to Soendergaard, the practice of casting out demons involved praying, sometimes alone and sometimes in a group, and could last from a few minutes to a few hours.  He stated that the practice could be scary and violent, with participants needing to be held down by three to five people, and that the participants would sometimes try to hurt others or themselves.  He stated that he had participated in the practice of casting out demons for around 21 years, and said he "cast out demons" from children as young as nine years old and elderly people.

Soendergaard testified that the church had participated in three movies and a Danish television show.  He stated that around 2017, a man approached him to talk about a documentary that Soendergaard believed would be about repentance and deepening other people's faith.  However, from Soendergaard's perspective, the 2019 documentary, entitled "G-d's Best Children," painted "The Last Reformation" in a negative light.  He claimed the documentary depicted him and other members of the ministry as dangerous

and presented the casting out of demons as traumatizing.  After the documentary aired, people talked about it on the news and online, and Soendergaard received threats stating that he needed to go to jail and stop abusing women.

Soendergaard stated that when the second part of the documentary aired, he continued to receive threats, and the Danish government and children's advocacy organizations started voicing their concerns.  Government members talked about the documentary in the news, and the documentary was used to bolster support for a law already in progress that was aimed at protecting people from mental abuse.  He claimed that the Danish parliament also began discussing the documentary and possible legal actions against Soendergaard to outlaw his practice of casting out demons.

Soendergaard testified that the final part of the documentary series painted him as a fraud.  He stated that, in the documentary, he was interviewed and asked if he had taken medicine away from people, and he said that he had not.  However, according to Soendergaard, the documentary showed otherwise and took his words out of context.  He also claimed that the documentary showed another man named Christian, who had been convicted of quackery[2] in 2011 in Denmark, and the documentary stated that people should go after Soendergaard the same way.

---

[2] According to Soendergaard, in Denmark, "quackery" was a promise of a result without having proof, such as someone treating another without having a license.

Soendergaard further testified that after the final part of the documentary aired, politicians and the media continued to call for an investigation into his activities and for criminal penalties. He said that he also continued to receive threats to his life.

Soendergaard stated that, before leaving Denmark, in 2017 and 2018 six different government agencies spoke with him related to claims that students in his ministry were working unlawfully, that there were fire hazards in his ministry building, the ministry was not paying taxes, the building was not up to code, and they had heard that Soendergaard was abusing his family. None of these government investigations resulted in his arrest or criminal charges, and he was never officially accused of any wrongdoing.

Soendergaard testified that he did not originally come to America to seek asylum. However, he explained that while he had been in the United States, everyone was afraid, including the students at his schools. The teachers and students were afraid that people would come after them, so no one came to the schools and several facilities closed. Soendergaard came to the United States hoping that the problems would disappear, but the situation continued to worsen as politicians continued talking about him. Although Soendergaard and his family initially did not want to seek asylum or stay in the United States, the worsening conditions and the passage of a new law, § 243 of the Danish Criminal Code, made them decide to file for asylum.

Soendergaard referred to this new law, which went into effect in April 2019, as a mental abuse law. Under the law, he believed

23-11629                Opinion of the Court                7

he could face prison time for casting out demons as a form of mental abuse. He asserted that Denmark already viewed him as guilty, so he could not have meetings, pray for people, or worship with people if returned to Denmark. Although the law did not specifically reference "casting out demons," to him, it was clear from the law that he was being targeted because people were pressing the Danish government to pass the law to condemn him. He stated that, if he returned to Denmark, he would not stop his ministry and would continue to practice casting out demons, but he feared being continuously jailed for doing so. He stated there was no way to practice his faith without casting out demons, and that he would continue to be imprisoned as politicians and child advocates came after him. He expressed that it was not possible for him to move to another part of Denmark because the country was so small. He acknowledged that there were other Pentecostal-Charismatic ministers in Denmark, but he stated he was the only minister who practiced casting out demons. His friend Christian had practiced it, but the government came after him, so he left Denmark.

Soendergaard acknowledged that he had been freely "casting out demons" since 2002, and that before the documentary came out, no one from the government pressed him about the issue. Evidence was presented of the Danish law Soendergaard opposed, which provided, in relevant part:

> a person who belongs to, or is closely associated with the household of another person, or who has previously had such an association with the household, and who repeatedly, over a period of time subjects the

other person to grossly degrading, harassing, or abusive behavior, that is likely to control the other person in an undue manner, shall be punished for physical violence by a fine, or by imprisonment for up to three years.

Soendergaard believed that the law targeted him given the government and the media's portrayal of him that led to the law's passage. He knew there were still people in Denmark who followed "The Last Reformation," and were meeting surreptitiously to avoid any conflicts. Additionally, he acknowledged that people still practiced casting out demons in Denmark without being prosecuted or charged, but he believed that was because no one knew they were doing it and noted that many people had stopped. He further acknowledged that his son remained in Denmark and that no one from the Danish government had approached him.

Soendergaard admitted he was never accused of, or charged by the government of, abusing anyone. Instead, he stated that he and his family were worried that they would be arrested based on a phone call he received from a friend telling him to leave Denmark. This friend did not work for the police or the government, but instead worked for another ministry and was aware of the changes in the law.

Soendergaard then called Dr. Michael Brown to testify on his behalf, and Dr. Brown stated that he was an author and host of a national radio show where he discussed religious persecution worldwide. He met Soendergaard in 2019 and was familiar with

the documentary on "The Last Reformation." Dr. Brown had not written about religious persecution in Denmark but had performed some general research about religious persecution in Scandinavia. He testified that Soendergaard's ministry in Denmark was perceived as cult-like, abnormal, and a challenge against the established Lutheran religion. He believed that Danish society would view Soendergaard as dangerous to Denmark's religious institutions because the name "The Last Reformation" suggested those institutions were deeply flawed. He believed Soendergaard's fears of going back to Denmark were justified, and that there was a risk that his children would be taken from him or that he would not be able to practice his faith freely. Dr. Brown was not familiar with anyone else in Denmark whose ministry was taken away from them, but he did know that some Danish Christians had come to the United States seeking more religious freedom. He maintained that Soendergaard, however, was in a different situation because he practiced his faith more publicly.

Ultimately, the IJ denied Soendergaard's application for asylum. The IJ found Soendergaard credible but determined that he failed to establish past persecution or a well-founded fear of future persecution. To past persecution, the IJ found that Soendergaard had not pointed to the past persecution of any individuals or himself. As to a well-founded fear of future persecution, the IJ found that Soendergaard met the subjective component of a persecution claim because he showed that he was personally afraid of what would happen to him and his family if they returned to Denmark. However, as to the objective component, the IJ found that

Soendergaard had not shown that he would be subjected to any type of future persecution based on his religious beliefs.

Soendergaard appealed the IJ's decision to the BIA. While his appeal was pending, he also filed a motion to remand before the BIA. In the motion, Soendergaard argued that, during the hearing before the IJ, an activist critical of Soendergaard illegally recorded the hearing and later disseminated the video online, which alerted the Danish population and government of his claims of persecution. He stated that several media platforms referenced the video, including a press outlet associated with the Danish National Church. He also asserted that members of the Danish government discovered the video and discussed it on Facebook. He argued that this evidence previously was unavailable and, thus, newly discovered and showed an even greater probability of persecution upon return to Denmark, where he would be deemed a radical cult leader. Thus, he requested that the BIA remand to the IJ for consideration of this new evidence.

Ultimately, the BIA dismissed Soendergaard's appeal and denied his motion to remand. As to his appeal, the BIA held that Soendergaard failed to show a well-founded fear of future persecution rather than a fear of prosecution under fairly administered laws. The BIA found that other followers of "The Last Reformation" had continued to "cast out demons" in Denmark but had not been arrested or harmed by the passage of § 243. It also found that, although Soendergaard referenced his friend who left Denmark after facing prosecution, the friend was prosecuted for

quackery before the passage of § 243, and Soendergaard failed to establish that a friend or other similarly situated individual had been arrested or harmed by public officials on account of their religion after the passage of § 243.  The BIA also found that a member of the Danish parliament's reference to the documentary in support of the law did not by itself adequately show that the law concerning psychological abuse was designed to target Soendergaard or the practice of casting out demons.  It found that, although individuals called for his prosecution under quackery or child abuse laws after the documentary aired, he was never charged with these offenses, and he did not establish evidence of pretextual prosecutions or unfair trial procedures in Denmark that would demonstrate a well-founded fear of persecution.  Thus, the BIA affirmed the IJ's decision denying asylum.

As to Soendergaard's motion to remand, the BIA found that the Danish public was already aware of Soendergaard's religious practices, and the additional information did not adequately show that Danish officials would punish individuals who had sought asylum in other countries, that they intended to engage in conduct constituting persecution or torture, or that they had arrested anyone similarly situated under the new law.  Thus, the BIA found that remand would be unwarranted because it likely would not change the result of the case.  Soendergaard now petitions this Court for review.

## II.    ANALYSIS

### A. Substantial Evidence Supports the BIA Denial of Soendergaard's Application for Asylum.

We review only the decision of the BIA, except to the extent that the BIA expressly adopts or explicitly agrees with the IJ's decision. *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 403 (11th Cir. 2016). In deciding whether to uphold the BIA's decision, we are limited to the grounds upon which the BIA relied. *Id.*

We review legal conclusions *de novo* and review factual findings for substantial evidence. *Perez-Zenteno v. U.S. Att'y Gen.*, 913 F.3d 1301, 1306 (11th Cir. 2019). Under the substantial evidence standard, we "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Id.* (internal quotation marks omitted) (quoting *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (*en banc*)). Under this standard of review, "we must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence" in consideration of the entire record. *Id.* (internal quotation marks omitted) (quoting *Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 818 (11th Cir. 2004)). To reverse the BIA, we "must find that the record not only supports reversal, but compels it." *Id.* (internal quotation marks omitted) (quoting *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1287 (11th Cir. 2003)). "[T]he mere fact that the record may support a contrary conclusion is not enough to justify a reversal." *Adefemi*, 386 F.3d at 1027.

To meet the burden of establishing eligibility for asylum, a noncitizen must, "with specific and credible evidence," establish (1) past persecution based on a statutorily protected ground, or (2) a "well-founded fear" that the noncitizen will be persecuted on account of a protected ground. *Diallo v. U.S. Att'y Gen.*, 596 F.3d 1329, 1332 (11th Cir. 2010); 8 C.F.R. § 1208.13(a), (b). The protected grounds include, among other things, religion and political opinion. 8 U.S.C. § 1158(b)(1)(B)(i); 8 C.F.R. § 1208.13(a), (b). Persecution "is an extreme concept," which requires "more than a few isolated incidents of verbal harassment or intimidation," because "mere harassment does not amount to persecution." *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1008 (11th Cir. 2008) (internal quotation marks omitted) (quoting *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1232 (11th Cir. 2007)). Additionally, "[p]ersecution . . . does not include every sort of treatment that our society regards as offensive." *Min Yong Huang v. Holder*, 774 F.3d 1342, 1346 (11th Cir. 2014) (internal quotation marks omitted) (quoting *Shi v. U.S. Att'y Gen.*, 707 F.3d 1231, 1235 (11th Cir. 2013)).

Establishing "past persecution creates a rebuttable presumption of a well-founded fear of future persecution." *Id.* at 1007. In the absence of past persecution, an asylum applicant may establish a well-founded fear of future persecution that is subjectively genuine and objectively reasonable based on a statutorily protected ground. *Id.* The objective component requires that the applicant show a reasonable possibility of suffering persecution, either by being singled out for persecution or being identified with a persecuted

group. *Li Shan Chen v. U.S. Att'y Gen.*, 672 F.3d 961, 965 (11th Cir. 2011).

We have held that "having to practice religion underground to avoid punishment is itself a form of persecution." *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1354 (11th Cir. 2009). However, we have also held that "[f]ear of prosecution under fairly administered laws . . . does not ordinarily entitle [a noncitizen] to asylum." *Scheerer v. U.S. Att'y Gen.*, 445 F.3d 1311, 1315 (11th Cir. 2006). "If, however, the [noncitizen] shows the prosecution is based on a statutorily-protected ground, and if the punishment under that law is sufficiently extreme to constitute persecution, the law may provide the basis for asylum . . . even if the law is generally applicable." *Id.* at 1316.

On appeal, Soendergaard argues that the BIA erred in concluding he was not entitled to asylum. He contends that the evidence he presented supports the finding that he was singled out by Danish politicians during the passage of § 243 and that, if removed, he would be forced to practice his religion in hiding.

Here, substantial evidence supports the BIA's determination that Soendergaard failed to meet his burden of demonstrating an objective fear of persecution based on his religious beliefs and practices if he were removed to Denmark. *De Santamaria*, 525 F.3d at 1007. As the BIA recognized, a fear of prosecution under fairly administered laws does not ordinarily entitle a noncitizen to asylum. *Scheerer*, 445 F.3d at 1316. Based on Soendergaard's own testimony, § 243 on its face does not single out him or his religion, nor

has the law been used to single out followers of "The Last Reformation" that were still in Denmark, including Soendergaard's son. The only person that Soendergaard pointed to who was prosecuted by the Danish government for their beliefs was prosecuted in 2011 under a different law for quackery. Also, even if Soendergaard could show that § 243 was generally applicable, yet still used to single out him and his religion, he showed at best that Danish society viewed him and his ministry as cult-like and that the Danish government saw him as challenging the state religion and had concerns that his ministry's practices could potentially cause physical or mental harm to the practitioners. However, this does not rise to the extreme level of persecution that would entitle Soendergaard to relief. *Min Yong Huang*, 774 F.3d at 1346; *Scheerer*, 445 F.3d at 1315.

Further, Soendergaard failed to show the law would conflict with his freedom to openly practice his religion. Soendergaard testified that no one from his ministry was prosecuted under § 243, and Dr. Brown testified that he was not aware of the Danish government taking away anyone's ministry. Although Soendergaard and Dr. Brown both testified that Soendergaard was different because he practiced his religion more publicly, the evidence shows that Soendergaard was "casting out demons" since 2002, and no one from the government had questioned him. Further, Soendergaard testified that the government investigated him before and after the documentary, but there was never any finding of wrongdoing, and he was never accused or charged by the government of abusing anyone. Soendergaard has not provided any evidence,

absent his own unsubstantiated fears, that the Danish government would do anything different upon his return to Denmark or would limit the exercise of his religion, and those unsubstantiated fears do not compel reversal of the BIA's decision. *Perez-Zenteno*, 913 F.3d at 1306. Thus, we deny his petition for review.

### B. The BIA Did Not Abuse Its Discretion in Denying Soendergaard's Motion to Remand.

When a petitioner files a motion to remand with the BIA seeking to introduce evidence that had not been previously presented, such motion is generally treated as a motion to reopen. *Chacku v. U.S. Att'y Gen.*, 555 F.3d 1281, 1286 (11th Cir. 2008). We review for an abuse of discretion the BIA's denial of a motion to reopen. *Id*.

Motions to reopen are disfavored. *Jiang v. U.S. Att'y Gen.*, 568 F.3d 1252, 1256-57 (11th Cir. 2009). Thus, we give significant discretion to the BIA to deny a motion to reopen, "even where the movant has made a *prima facie* case that reopening would otherwise be appropriate." *Bing Quan Lin v. U.S. Att'y Gen.*, 881 F.3d 860, 873 (11th Cir. 2018). The BIA may deny a motion to reopen where the movant fails to produce evidence that was material and previously unavailable. *Id*. A noncitizen "who attempts to show that the evidence is material bears a heavy burden and must present evidence that demonstrates that, if the proceedings were opened, the new evidence would likely change the result in the case." *Jiang*, 568 F.3d at 1256-57.

Section 1252(d)(1) of the Immigration and Nationality Act provides, in relevant part, that a court can review a final order of removal only if "the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). We have held that "[a] petitioner has not exhausted a claim unless he has both raised the 'core issue' before the BIA, and also set out any discrete arguments he relies on in support of that claim." *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 800 (11th Cir. 2016) (internal quotation marks and citations omitted). However, this obligation to exhaust administrative remedies is a claims-processing rule and is not jurisdictional, meaning it is subject to waiver and forfeiture. *Santos-Zacaria v. Garland*, 598 U.S. 411, 423 (2023). Section 1251(d)(1), as a claims-processing rule, is generally applied when it has been asserted by a party. *Kemokai v. U.S. Att'y Gen.*, 83 F.4th 886, 891 (11th Cir. 2023).

On appeal, Soendergaard contends that the BIA abused its discretion when it denied his motion to remand. He contends that the dissemination of the recording of his IJ hearing violated applicable regulations and agency policy, and the evidence of the recording being disseminated and discussed throughout Denmark was material to his asylum application. In response, the government argues that, to the extent Soendergaard's contention attempts to raise a distinct claim that his right to a confidential asylum hearing pursuant to federal regulations was violated, that this Court cannot review such challenge because Soendergaard failed to make that distinct claim before the BIA. It also argues that the BIA did not abuse its discretion in denying the motion to remand.

Here, the BIA did not abuse its discretion in denying Soendergaard's motion to remand based on the recording taken during his hearing because that evidence was not material and did not show that the result of Soendergaard's case would be different if the IJ had considered that evidence. *Jiang*, 568 F.3d at 1256-57. The evidence of the recording and the subsequent reaction of individuals in Denmark was merely cumulative of the evidence Soendergaard originally presented, and such evidence does not overcome Soendergaard's heavy burden of proving materiality to justify reopening the proceedings. *Id.* Accordingly, we deny the petition for review as to this issue.

Further, to the extent that Soendergaard raises a claim that his right to a confidential asylum hearing under federal regulations was violated, he failed to exhaust this claim before the BIA. Thus, because the government seeks to enforce the claims-processing rule barring unexhausted arguments, we dismiss the petition for review as to that argument. *Kemokai*, 83 F.4th at 891.

### III.    CONCLUSION

For the reasons outlined above, we **DENY IN PART AND DISMISS IN PART** Soendergaard's petition for review.